UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------- x
                   :
NOBERTO LORENZO          :          3:18 CV 1433 (RMS)
                   :
V.                      :
                   :
COMMISSIONER OF      :
SOCIAL SECURITY       :       DATE: JULY 18, 2019
                   :
-------------------------------------------------- x

## RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF THE COMMISSIONER

This action filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff disability insurance benefits ["SSDI"].

I.    ADMINISTRATIVE PROCEEDINGS

On February 17, 2015, the plaintiff filed an application for SSDI claiming that he had been disabled since April 1, 1995, when he was twenty-two years old, due to congenital cerebellar vermian hypoplasia,[1] learning disabilities, developmental delay of language and motor skills, depression, autism spectrum disorder, short-term memory impairment, and difficulty retaining information and remembering. (Certified Transcript of Administrative Proceedings, dated September 27, 2018 ["Tr."] 142, 222-23; *see* Tr. 81). The plaintiff's application was denied initially and upon reconsideration (Tr. 105-06, 157-59), and on November 30, 2016, a hearing was

---

[1] Cerebellar hypoplasia is a neurological condition in which the cerebellum is smaller than usual or not completely developed. It is a feature of a number of congenital malformation syndromes. Some of the disorders associated with cerebellar hypoplasia are progressive, and other disorders that feature cerebellar hypoplasia are not progressive. https://www.ninds.nih.gov/Disorders/All-Disorders/Cerebellar-Hypoplasia-Information-Page (last visited, June 5, 2019).

held by videoconference with ALJ Ellen Parker Bush presiding; the plaintiff testified by video from Hartford, Connecticut, and a vocational expert and the ALJ were located in Lawrence, Massachusetts. (Tr. 59-80; *see* Tr. 208, 302-04).[2] On January 18, 2017, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits (Tr. 136-56), and on January 27, 2017, the plaintiff filed a request for review of the hearing decision. (Tr. 214-21). On July 23, 2018, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-4).

On August 22, 2018, the plaintiff, proceeding *pro se*, as an unrepresented party, filed his complaint in this pending action (Doc. No. 1), and on September 20, 2018, the parties consented to the jurisdiction of a United States Magistrate Judge. (Doc. No. 14). This case was transferred accordingly. On October 23, 2018, defendant filed his answer and administrative transcript, dated September 27, 2018. (Doc. No. 15). On December 14, 2018, the plaintiff filed a "Stipulation of Facts" (Doc. No. 18), followed by a Motion to Reverse the Decision of the Commissioner, on January 10, 2019. (Doc. No. 20; *see* Doc. No. 19). On February 28, 2019, the defendant filed his Motion to Affirm (Doc. No. 21), and brief in support (Doc. No. 22-1 ["Def.'s Mem."]).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 20) is *denied*, and the defendant's Motion to Affirm (Doc. No. 21) is *granted.*

II.    FACTUAL AND PROCEDURAL BACKGROUND

On March 16, 2010, the plaintiff applied for Supplemental Security Income benefits ["SSI"], alleging disability since December 31, 2008. (Tr. 12-18; *see* Tr. 239-46). A hearing was held in New Jersey on October 12, 2011 (Tr. 25-58), at which the plaintiff, a non-attorney

---

[2] As discussed below, the ALJ stopped the hearing to prevent the plaintiff from perjuring himself. (*See* Tr. 76-78). The vocational expert never testified.

representative for the plaintiff, and a Spanish language interpreter appeared. (Tr. 25). At that time, the plaintiff was homeless, and his representative stated that she planned to get his treatment records but had not received them at the time of the hearing. (Tr. 31-32). The plaintiff testified that he attended school until eighth grade and completed his GED in Mayaguez, Puerto Rico. (Tr. 37). He came to the United States in February 2010; he does not speak any English. (Tr. 38). The plaintiff testified that he sold clothing for his family (Tr. 38-39), but had not been able to secure work in a private business. (Tr. 39). He left the family business because he "couldn't put up with the pressure and the humiliation." (Tr. 39). The plaintiff testified that he had memory problems, and that he watched television, but could not remember what he watches. (Tr. 41-42). He explained that he is friendly, and he had lived with friends on occasion. (Tr. 43). The ALJ denied that application for benefits on April 10, 2012. (Tr. 116-35; *see* Tr. 85). Three years later, SSA granted the plaintiff SSI benefits. Although only portions of that underlying application are in the transcript, the record reflects that in 2015, the plaintiff was found "disabled" with an onset date of March 1, 2015. (Tr. 103). Moreover, at the end of her decision on the plaintiff's application for SSDI, the ALJ noted that her decision "has no effect on [the plaintiff's] current receipt of [SSI] benefits." (Tr. 151).

On November 30, 2016, the ALJ held a hearing on the underlying application for SSDI benefits. (Tr. 61). On the date of that hearing, the plaintiff was 44 years old. (Tr. 68).[3] The plaintiff, who only communicates in Spanish, appeared at this hearing with a translator, but without an attorney. (Tr. 61). The ALJ offered the plaintiff a postponement so that he could secure the assistance of an attorney, but the plaintiff insisted that he wanted to go forward. (Tr. 64). The ALJ then gave the plaintiff a waiver of representation form, and the interpreter read it

---

[3] As discussed above, the plaintiff testified by video from Hartford; the ALJ presided over the hearing from Lawrence, Massachusetts. (Tr. 142).

to the plaintiff before he signed the document. (Tr. 64-66). Once the waiver of representation form was signed, the ALJ commenced her examination of the plaintiff.

The plaintiff testified that, when he was 35 years old, he first "found out about [his] condition[,] [and he] quickly came to exercise [his] rights . . . as a disabled person." (Tr. 68). The plaintiff moved to the United States from Puerto Rico, locating first to Florida, and then to New Jersey, before settling in Connecticut. (Tr. 69-70). He stayed with friends and relatives in each location (Tr. 70), and then, when he arrived in Connecticut, his mother stayed with him for the first month. (Tr. 70). He has cousins who live in the Hartford area, but "none of them care for [him]." (Tr. 71).

In his application for benefits in 2010, the plaintiff's "girl-friend" reported that he "[b]asically stay[ed] home watching tv all day." (Tr. 332; *see* Tr. 356). He needed reminders to do things, and he took a long time to do most things. (Tr. 334, 354-55). He shopped for groceries and cooked microwavable meals. (Tr. 334-36, 352). The plaintiff did not handle stress well, and he was "afraid of people and places." (Tr. 338; *see* Tr. 355).

The plaintiff could drive, but did not have a Connecticut license. (Tr. 71). He had a Florida driving license, which he obtained for identification. (Tr. 71).

He attended school until tenth grade and received his GED after two attempts to pass the exam. (Tr. 72-73, 325; *but see* Tr. 271 (plaintiff reported he "left school in 8th grade because [he] couldn't continue with [his] condition")). His school reports reflected grades ranging from A to F. (Tr. 347-48). He received a two-year certificate in computers in 2002, and he learned how to use PowerPoint and Microsoft Word. (Tr. 73, 75).

The ALJ explained to the plaintiff that, under his application for SSDI, "in order to be found eligible[ for benefits,] . . . [he] would have to prove that [he was] disabled before 2000,

that's 15 years ago." (Tr. 63). The ALJ told the plaintiff that the records she had, showed that the plaintiff was working in 1995 and 1996. (Tr. 63).[4] The plaintiff initially responded that it was "[o]ne thing . . . to be able to work, another . . . is to be forced to work because of food, because if [he] didn't work[,] [he] couldn't eat." (Tr. 63-64).

Next, the ALJ asked the plaintiff about the period between 1993 and 1996 when he filed taxes for self-employment. (Tr. 75-76). The plaintiff testified that "[t]hose businesses were [his] mom's"; his mother stole his identify so that she could open businesses in her name and benefit from them. (Tr. 76). According to the plaintiff, he was forced to be at her store, but he could not perform the work. (Tr. 76).

At this point, the ALJ stopped the plaintiff and recommended that he get an attorney because "either you did the work and this is what credit you got for doing the work that allows you to be eligible for Social Security, or you didn't do the work and your mother stole your Social Security number and now you are not eligible for Social Security." (Tr. 76). The plaintiff then asked about his "right from being born as a victim without right to being able to work[.]" (Tr. 77). The ALJ explained that, to be eligible for SSDI, the plaintiff must have earned credits through his work history, and for that, the plaintiff's limited employment in 1993, 1994, 1995 and 1996, was relevant. (Tr. 77). She explained further that he could not obtain benefits as a child unless his mother applied for benefits, but that Supplemental Security Income benefits are not available in Puerto Rico. (Tr. 78).

When the plaintiff asked if he had the "necessary points to get Social Security?", the ALJ responded, "Not if you did not work." (Tr. 78). In response, the plaintiff said, "Well, put down

---

[4] In his application for benefits, the plaintiff reported that he worked in a clothing store for five hours a day, five days a week from 1993 to May 30, 2004. (Tr. 326).

that I worked." (Tr. 78). At that point, the ALJ stopped the hearing to prevent the plaintiff from

perjuring himself, because the plaintiff was not "able to tell . . . accurate information." (Tr. 78).

## III.   THE ALJ'S DECISION

Following the five-step evaluation process,[5] the ALJ found that the plaintiff last met the

insured status requirements on June 30, 2000 (Tr. 144), and that the plaintiff did not engage in

substantial gainful activity during the period from his alleged onset date of April 1, 1995, through

his date last insured of June 30, 2000. (Tr. 145, citing 20 C.F.R. § 404.1571 *et seq.*).

At step two, the ALJ concluded that, through the plaintiff's date last insured, he had the

medically determinable impairment of congenital cerebellar vermain hypoplasia, which was not

diagnosed prior to the date last insured, but which was "designated a medically determinable

impairment based upon medical opinions that the condition existed since birth." (Tr. 145, citing

20 C.F.R. § 404.1521). The ALJ stated that, through the plaintiff's date last insured, the plaintiff

did not have an impairment or combination of impairments that significantly limited the ability to

perform basic work-related activities for twelve consecutive months; therefore, the claimant did

not have a severe impairment or combination of impairments. (Tr. 145, citing 20 C.F.R. § 404.1521

*et seq.*). Specifically, the ALJ concluded that the medical evidence of the plaintiff's congenital

---

[5] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520(a). First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

vermain hypoplasia "fail[ed] to support more than minimal limitations in the claimant's ability to perform work activities on a regular and consistent basis prior to June 3, 2000." (Tr. 146). In reaching this conclusion, the ALJ relied on the prior ALJ decision, dated April 10, 2012, in which that ALJ, based on the same evidence, found that the plaintiff was not disabled for the purpose of receiving Supplemental Security Income benefits as of December 31, 2008. (Tr. 146). Additionally, the ALJ indicated that the medical evidence did not support more than minimal limitations prior to June 2000, and no medical evidence existed prior to 2008. (Tr. 147). The ALJ considered the four broad functional areas for evaluating a degenerative neurological disorder before concluding that the plaintiff's mental impairment caused no more than "mild" limitation in any of the functional areas. (Tr. 149-50). Accordingly, the ALJ concluded that the plaintiff was not under a disability at any time from April 1, 1995, the alleged onset date, through June 30, 2000, the date last insured. (Tr. 151, citing 20 C.F.R. § 404.1520(c)).

IV. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d

Cir. 1998) (citation omitted). "The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact." *Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citing *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.     DISCUSSION

The plaintiff argues that the receipt of disability benefits is "a right that by law belongs to people [] who were born with a condition, as it was in [his] case or their disability came before their adulthood[,]" and the disability "will never allow them to work[,]" and "their parents always . . . paid their Social Security taxes, it is because of this that [d]isability [benefits] belong to [him.]" (Doc. No. 20 at 2). The plaintiff claims that the medical record supports his claim that he is disabled due to cerebellar vermis hypoplasia and Joubert Syndrome[6] "for May/2016" and autism spectrum disorder "for June/2016[.]" (Doc. No. 20 at 3). The plaintiff claims that his family did not tell him that he was born with cerebellar vermis hypoplasia; they forced him to work, and, had he known of his condition earlier in life, he would have "done everything possible for other people to help [him] . . . look for [his] disability benefits[.]" (Doc. No. 20 at 4).

---

[6] Joubert syndrome is a combination of brain abnormalities that together are known as the molar tooth sign, which can be seen on brain imaging studies, such as MRIs. The signs and symptoms of this condition vary among affected individuals. https://ghr.nlm.nih.gov/condition/joubert-syndrome. (last visited May 28, 2019).

A.    THE PLAINTIFF'S *PRO SE* STATUS

It is well-settled that the duties of an ALJ to "scrupulously and conscientiously . . . explore the relevant facts," "are heightened when a claimant, such as [the plaintiff in this case,] proceeds *pro se*." *Morlando v. Astrue*, No. 3:10 CV 1258(MRK), 2011 WL 4396785, at *4 (D. Conn. Sept. 10, 2011) (multiple citations and internal quotations omitted). Additionally, "the Second Circuit has . . . emphasized the extra care necessary 'when adjudicating the claims of a litigant whose mental capacity is in question.'" *Id.* (quoting *Chapman v. ChoiceCare Long Island Term Disability Plan,* 288 F.3d 506, 514 (2d Cir. 2002)).

In this case, the plaintiff was represented by a non-attorney advocate at his October 2011 hearing, and thus, was aware of the importance of securing the assistance of someone familiar with the administrative process. The plaintiff, however, appeared at his 2016 hearing without a representative, and, to date, has proceeded as a self-represented party.

At the commencement of his 2016 hearing in connection with the application for benefits at issue in this case, the ALJ offered the plaintiff a postponement on the hearing so that he could secure the assistance of an attorney, but the plaintiff insisted that he wanted to go forward on his own. (Tr. 64). Next, the ALJ gave the plaintiff a waiver of representation form, and the interpreter read it to the plaintiff before he signed the document. (Tr. 64-66). Then, as the plaintiff was testifying, the ALJ cautioned the plaintiff and recommended that he get an attorney because he was testifying inconsistently about his work history. (Tr. 76). The ALJ explained to the plaintiff that he needed a work history to be eligible for SSDI (Tr. 77), but when the plaintiff insisted on altering his testimony to fit the eligibility requirements, the ALJ stopped the hearing, telling the plaintiff that she must stop him from testifying because he was not "able to tell . . . accurate information." (Tr. 78).

After the ALJ issued her unfavorable decision, denying the plaintiff benefits, the plaintiff, still proceeding *pro se*, filed a timely request for review to the Appeals Council, and then commenced a timely action in this Court. Additionally, although the plaintiff does not communicate in English, he complied with the Court's scheduling orders and dutifully pursued this appeal of the administrative action.

B.    ELIGIBILITY FOR SSDI

The plaintiff, who currently receives SSI benefits, is appealing his denial of SSDI benefits. (*See* Tr. 103, 151). SSDI benefits are tied to a claimant's work history, whereas SSI benefits are not. Contrary to the plaintiff's understanding that the receipt of disability benefits is a "right," the plaintiff must qualify for benefits. To qualify for SSDI, the plaintiff must be insured for disability insurance benefits. 42 U.S.C. § 423(a)(1)(A), (c)(1); 20 C.F.R. §§ 404.101(a), 404.110-130. There are two requirements for eligibility: the applicant must have (1) a work history that includes adequate social security earnings to be "fully insured," 20 C.F.R. §§ 404.110-404.115; and, (2) "'disability insured status' in the quarter he became disabled or in a later quarter in which he was disabled." 20 C.F.R. § 404.131(a); *see Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).

The plaintiff's testimony about his work history was inconsistent with his work record. In his application for benefits, the plaintiff reported that he worked in a clothing store for five hours a day, five days a week from 1993 to May 30, 2004. (Tr. 326). At the hearing, however, the plaintiff testified that he was forced to be at his mother's clothing store, but he could not perform any work. (Tr. 76). The documented work record reflects earnings from 1993-1996 and again in 2004. (Tr. 231, 237; *see also* Tr. 75-76 (1993-1996 taxes filed for self-employment)). The plaintiff testified, however, that the businesses he worked for "were [his] mom's[,]" and his mother stole his identify so that she could open businesses in her name for her own benefit. (Tr.

76). Additionally, in April 2015, the plaintiff reported to Angelica Maria Valentin-Colon, Psy.D., who conducted a psychological evaluation of the plaintiff in connection with his application for benefits (Tr. 373-78), that he never had a formal job, but worked in his mother's store doing miscellaneous work "for the food that he consumed." (Tr. 373).

The defendant is correct that if the plaintiff did not work at his family's clothing store, then he is not eligible for disability insurance benefits because he failed to earn the necessary quarters of coverage to qualify for SSDI. (Def.'s Mem. at 2 n.1). Conversely, if he did work during this relevant period, his work history belies his claim that he was disabled and unable to work. (*Id.*).

Despite this inconsistency, the ALJ, weighing the plaintiff's testimony in a light most favorable to the plaintiff, concluded that the plaintiff's work history, from the years he spent working in his family's clothing store, gave him disability insured status to June 30, 2000. (Tr. 145). Thus, for the plaintiff to be eligible for SSDI, he must have been disabled while he was insured, that is, before June 30, 2000.

C. ONSET DATE OF DISABILITY

The plaintiff alleges that his onset date of disability – the date he claims that he could no longer work due to his medical condition – was April 1, 1995. Thus, the relevant period at issue for this application for SSDI is April 1, 1995 to June 30, 2000. Accordingly, in the first step of the sequential analysis, the ALJ found that the plaintiff last met the insured status requirements on June 30, 2000 (Tr. 144), and he did not engage in substantial gainful activity during the period from his alleged onset date of April 1, 1995, through his date last insured of June 30, 2000. (Tr. 145, citing 20 C.F.R. § 404.1571 *et seq.*).

D. SEVERITY OF THE PLAINTIFF'S IMPAIRMENTS

At the next step, the ALJ concluded that, although it was not diagnosed prior to the plaintiff's date last insured, the plaintiff had congenital cerebellar vermain hypoplasia, which is "designated a medically determinable impairment based upon medical opinions that the condition existed since birth." (Tr. 145, citing 20 C.F.R. § 404.1521). The mere existence of this impairment, however, does mean that the plaintiff qualifies for benefits. A person is disabled under the Social Security Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual must have a "severe impairment[,]" which is an impairment that "significantly limits [an individual's] physical or mental ability to do basic work activities." *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). An individual's impairment is disabling if it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial work which exists in the national economy." 42 U.S.C. § 423(a)(2)(A). "Because the [plaintiff] has a congenital brain abnormality," the ALJ "considered the four broad functional areas set out in the disability regulations for evaluating a degenerative neurological disorder, Listing 11.17B (chronic brain syndrome) with reference to the mental disorders, specifically 12.02, and in section 12.00C of the Listing of Impairments": (1) understanding, remembering or carrying out instructions; (2) interacting with others; (3) concentration, persistence or maintaining pace; and, (4) adaptation or managing oneself. (*See* Tr. 149-50).

The plaintiff bears the burden of establishing that his impairment was disabling during the period relevant to his application. *See Berry*, 675 F.2d at 467 (holding that the plaintiff "bears the initial burden of showing that his impairment prevents him from returning to his prior type of

employment.").  In this case, that means that the plaintiff must establish that his congenital vermian hypoplasia, or his other alleged impairments, so "significantly limit[ed]" his ability to do basic work activities, that he was unable to engage in any work from April 1, 1995, through June 30, 2000.  *Id.*  Moreover, the plaintiff has the burden of demonstrating that his impairment was disabling on or before June 30, 2000, when his insured status expired.  *Wagner v. Sec'y of Health and Human Svs.*, 906 F.2d 856, 860 (2d Cir. 1990).  The plaintiff can meet this burden by showing that the impairment was medically determinable, and that he was significantly limited in his ability to work during the relevant time. *See Woodmancy v. Colvin*, 577 F. App'x 72, 74 (2d Cir. 2014) (summary order) (citations omitted).

E.    THERE IS NO MEDICAL EVIDENCE IN THE RECORD TO ESTABLISH THAT THE PLAINTIFF HAD A DISABLING IMPAIRMENT DURING THE RELEVANT TIME PERIOD

In this case, the plaintiff has not satisfied his burden as the record does not support a finding that the plaintiff's congenital vermian hypoplasia had more than "minimal limitations in the claimant's ability to perform work activities on a regular and consistent basis prior to June 30, 2000."  (Tr. 146; *see* Tr. 145 (concluding that, through the plaintiff's date last insured, he did not have a severe impairment that limited the plaintiff's ability to do basic work-related activities)). As the ALJ found, no medical evidence exists prior to 2008, and the medical evidence, as it exists, does not support more than minimal limitations prior to June 2000.  (Tr. 146-47).

The first documented medical evidence in the record is an MRI of the plaintiff's brain on June 5, 2008, eight years after his date last insured. (Tr. 360, 485).  The MRI revealed "a *form fruste* of congenital ceriman hypoplasia."  (Tr. 360, 485). The radiologist recommended a follow-up examination "with attention to the posterior fossa."  (Tr. 360, 485). A follow up MRI, performed on January 14, 2016, was consistent with the 2008 findings.  (Tr. 398-99, 422-26 (revealing a

"[r]educed size of posterior fossa with mild hypoplasia of the cerebellar vermis[.]")). The ALJ appropriately found that this objective medical report "confirm[ed] the existence of a medical condition at birth, but speaks nothing about the intensity, persistence or limiting effects of the condition eight years or more prior to the discovery of this abnormality." (Tr. 146).

The plaintiff then underwent cognitive testing on September 1, 18, 22 and 29, 2009, by Dr. Mary A. Moreno Torres. (Tr. 367-72, 400-05; *see* Tr. 361-66). At that time, the plaintiff was 36 years old, living with his parents in Puerto Rico. (Tr. 367, 400). Dr. Torres noted that the 2008 MRI results showed cerebellar vermian hypoplasia; "[p]atients with these defects show difficulties in motor coordination and intellectual retardation." (Tr. 368, 401). On the Weschsler Intelligence Scale for Adults-III, the plaintiff fell within the below average intelligence level. (Tr. 368. 401). He had a "poor" ability to understand and make social judgments, and his "main weakness" existed in his short-term memory, immediate learning, visual perception, hand-eye coordination, cognitive flexibility and attention. (Tr. 369, 402). He had a "below average intellectual functioning with strengths in the fields requiring reasoning and organization of perceptual information, and in the fields of mathematical reasoning." (Tr. 369, 402). Dr. Torres noted "[s]ignificant shortcomings" in his capacity "to keep mental information while performing tasks, in speech understanding and perceptual and motor processing speed." (Tr. 369, 402). He scored below average in speech understanding, working memory, ready and fluency, and his scores were average in the areas of perceptual reasoning, identification of words, dictation, and text comprehension. (Tr. 370-71, 402-03). He scored borderline in processing speed, calculations, and mathematical fluency. (Tr. 371-71, 402-03). Dr. Torres noted that the plaintiff had deficits in working memory which "correspond[ed] with difficulties in a number of situations in everyday life, such as listening and reading comprehension problems." (Tr. 372, 405). Dr. Torres concluded that the plaintiff had

"difficulties between moderate and severe in his cognitive functioning[,]" his "immediate memory ability and verbal understanding [were] limited[,]" and his "speed for information processing [was] significantly limited." (Tr. 372, 405).

On April 16, 2010, nearly ten years after his date last insured, William W. Austin, Psy.D. and Roy E. Arroyo, Psy.D., completed an evaluation of the plaintiff in connection with his application for benefits (Tr. 454-56), in which they noted moderate impairment in the plaintiff's short-term memory and that, upon testing, the plaintiff's intellectual ability fell within the borderline range of intellectual functioning. (Tr. 456). The plaintiff reported that he spent his days watching television and exercising. (Tr. 455). No gait difficulties were noted; he was oriented; his attention and concentration were adequate; his speech was logical and coherent; and his thought processes were goal-oriented and concrete. (Tr. 455). The plaintiff's social functioning was limited based on his report of poor peer relationships, and his functional ability was limited by his assessed cognitive functioning. (Tr. 456).

The ALJ referenced both the 2010 assessment and the 2009 cognitive testing in her decision, concluding that they "revealed low average intellectual functioning." (Tr. 146). She noted, however, that, upon testing, Dr. Torres found that the plaintiff "did not show difficulties in his capacity to change the focus of attention from one aspect of a complex stimulus to another one[,]" and that his "skills in managing the attention and the pattern of change for an extended period were adequate for his age." (Tr. 149; *see* Tr. 404). Accordingly, the ALJ found that this evidence "supports, at most, mild limitations" prior to June 2000 in the plaintiff's concentration, persistence or maintaining pace, and in his ability to understand, remember or carry out instructions. (Tr. 149-50). The ALJ also relied on portions of Dr. Torres' report indicating that, although the plaintiff received occupational and physical therapy until he was fifteen years old, he

did not receive special education services in school, his mother reported that he was a "sociable man and has friends[,]" and he did not have "indicators of social or emotional problems." (Tr. 368). The ALJ appropriately relied on the results of this 2009 neuropsychological exam to conclude that, prior to June 2000, the plaintiff had, "at most, mild limitations in his ability to interact with others." (Tr. 149-50).

Additionally, the ALJ concluded that, although there was evidence of low average intellectual functioning, "a prior Administrative Law Judge, in a final decision dated April 10, 2012, considered that evidence when finding the claimant was not disabled for the purpose of receiving SSI benefits as of December 31, 2008[,]" (Tr. 146),[7] and, "unlike that decision, the record [here] shows no evidence of significant functional limitations directly associated with the condition prior to June 2000." (Tr. 149). In reaching this decision, the ALJ assigned "great weight" to the opinions of the State medical consultants "despite the claimant's credible evidence of borderline intellectual functioning and depression disorder[,]" concluding that the plaintiff was "still capable of coping with routine activities[ and] avoid[ing] common hazards, but ha[d] difficulty dealing with others, [was] able to perform activities of daily living and [could] interact appropriately with others." (Tr. 128).

There are several opinions of State medical consultants in the record. Dr. Carol Grant, who completed a consultative examination of the plaintiff in April 2010, noted the plaintiff reported a history of difficulty getting his thoughts into words, holding a conversation, following written and verbal instructions and remembering information he was given. (Tr. 458). There is no evidence, however, that the plaintiff's self-reported limitations relate back to the period at issue in this case,

---

[7] In that earlier decision, the prior ALJ found that the plaintiff had moderate restriction in his activities of daily living; moderate difficulties in social functioning, moderate difficulties in concentration, persistence or pace; and no episodes of decompensation. (Tr. 126).

nor does the evaluation, which was completed ten years after the plaintiff's date last insured, include a retrospective opinion. The ALJ gave "great weight" to Dr. Grant's conclusion that the plaintiff had "no neurological deficits," a normal gait, and an ability to squat and heel to toe walk without difficulty, which the ALJ found "more than likely corroborates [that he had] no limitations prior to June 2000." (Tr. 149).

On May 4, 2010, Deborah Carter, Ph.D., completed a Psychiatric Review Technique of the plaintiff in which she assessed Listings 12.02 (Organic Mental Disorders) and 12.04 (Affective Disorders) in connection with the plaintiff's application for benefits. (Tr. 462-75). Dr. Carter found that the plaintiff had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, and that he had no episodes of decompensation. (Tr. 472). Dr. Carter concluded that the plaintiff was able to perform tasks at home, but they required a "long time and effort, [and] he need[ed] reminders." (Tr. 474). Dr. Carter found that the plaintiff had moderate limitation in short term memory, and that there "appear[ed] to be moderate functional limits." (Tr. 474 (emphasis omitted)). Similarly, in the Mental Residual Functional Capacity Assessment, Dr. Carter assessed the plaintiff as moderately limited in his ability to understand, remember and carry out detailed instructions; moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; moderately limited in his ability to interact appropriately with the general public; and moderately limited in his ability to respond appropriately to changes in the work setting. (Tr. 477-78). Consistent with the ALJ's finding, Dr. Carter concluded that, as of 2010, the plaintiff "retain[ed] capacity to function mentally and socially[,] to perform [activities of daily living,] and to interact appropriately with others." (Tr. 479). Additionally, although Dr. Carter identified moderate functional limitations as

of 2010, there is nothing in this opinion to suggest it is retrospective to April 1995 to June 2000, the time period at issue in this case.

Five years later, on April 4, 2015, Dr. Valentin-Colon, a state agency consultant who conducted a psychological evaluation of the plaintiff in connection with his application for benefits, found that, upon testing, the plaintiff's cognitive functioning was in the low average range, and that he showed "significant difficulties to simultaneously store and manipulate orally presented information in short-term memory, remembering complex or multi-step instructions, as well as difficulties to mentally process simple or routine information without making mistakes." (Tr. 377). Consistent with the ALJ's assessment of the 2009 evaluations, Dr. Valentin-Colon opined that the plaintiff could understand and follow simple instructions and perform simple, repetitive tasks. (Tr. 378). Dr. Valentin-Colon added that the plaintiff "might need some accommodations in order to achieve his greatest potential." (Tr. 378).

The plaintiff underwent a neuropsychological evaluation by Sarah E. Bullard, Ph.D., ABPP, on March 28, 2016 to "more fully evaluate his cognitive functioning to aid with treatment planning in the context of his neurologic impairments." (Tr. 430-35). Dr. Bullard concluded that the results of the neuropsychological evaluation were consistent with the two previous evaluations which found the plaintiff's overall intellectual functioning in the low average range. (Tr. 433). His ability to process or make sense of visual information, "as long as he can perceive it, [was] intact and [fell] within the [a]verage range." (Tr. 433). Dr. Bullard concluded that, in 2016, the plaintiff had impaired verbal skills due to delayed language and learning difficulties, and though his impairments would interfere with his ability to maintain full time employment, he could maintain part time employment in a high structured job with routine tasks. (Tr. 433-34).

Next, the ALJ considered the opinion of State agency psychological consultant, Dr. Robert Deutsch, in connection with the plaintiff's subsequent application for SSI benefits. (Tr. 147). Dr. Deutsch opined that the plaintiff was disabled as of March 2015. (Tr. 98-101; *see* Tr. 103). Dr. Deutsch concluded that, as of that time, the evidence supported moderate and marked impairments in the plaintiff's functioning (Tr. 98-101),[8] but that there was "insufficient evidence" to assess whether the plaintiff had an impairment under the Listings for the period of April 1, 1995 to June 30, 2000. (Tr. 87-88). Dr. Deutsch explained that, for the plaintiff to be entitled to benefits in this case, his condition must be found to be "severe prior to [June 30, 2000]." (Tr. 89). He concluded that "[t]he evidence in the file is not sufficient to fully evaluate [his] claim and the evidence needed cannot be obtained." (Tr. 89). Thus, he opined that the plaintiff's condition "was not disabling on any date through [June 30, 2000]." (Tr. 89). The ALJ did not err in assigning "little weight" to Dr. Deutsch's 2015 opinion as his assessment was "fifteen years after the date last insured with disability commencing from March 2015 forward." (Tr. 148).

---

[8] Specifically, Dr. Deutsch concluded that the plaintiff had moderate restrictions in activities of daily living, moderate difficulties maintain social functioning, and marked difficulties maintaining concentration, persistence or pace. (Tr. 98). More specifically, he found that, as of March 2015, the plaintiff was markedly limited in his ability to remember locations and work-like procedures, markedly limited in his ability to understand, remember and carry out short, simple and detailed instructions, markedly limited in his ability to maintain attention and concentration, and markedly limited in his ability to sustain an ordinary routine without special supervision. (Tr. 99). He found that the plaintiff was markedly limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and markedly limited in his ability to interact with the general public, respond to changes in the work setting, and set realistic goals. (Tr. 100). Additionally, he found the plaintiff to be moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual, as well as moderately limited in his ability to get along with coworkers or peers without distracting them, and to set realistic goals or make plans independently of others. (Tr. 100). Dr. Deutsch explained that the claimant required an "excessive amount of time to learn new information due to both memory deficits and very slow processing speed" as he did "not have the capacity to learn and retain work-like procedures within a reasonable period of time" for substantial gainful activity. (Tr. 99). According to Dr. Deutsch, it is "unreasonable to believe that the claimant would be able to sustain" concentration, persistence and pace for two-hour periods during a normal workday, sustain an ordinary routine without special supervision, or carry out instructions in a competitive fashion. (Tr. 100). It is likely that the plaintiff's memory deficits would "interfere with his capacity to relate" with coworkers or work effectively with the general public. (Tr. 100). The plaintiff could not "be expect[ed] to respond to changes in routine within the context of a competitive work environment[,]" and while he could travel independently, he would require additional time to learn the travel routes. (Tr. 101). Dr. Deutsch concluded that the plaintiff would "require special supervision (Job Coach) in order to attempt to function in a simple routine repetitive type job." (Tr. 101).

The ALJ also noted that Dr. Joseph Trettel, Jr., a neurobehavioral specialist who treated the plaintiff in 2016, "identified some difficulty responding to nonverbal cues, but also observed intact long term memory, no word finding issues, no paraphrasias, no deficits in reading/writing/calculation, continuous task performance, and adequate attentional tone[.]" (Tr. 147). On May 26, 2016, Dr. Trettel conducted a neurobehavioral evaluation of the plaintiff (Tr. 436-43, 490-96), in which he noted no difficulty with basic comprehension, or any issues with short-term memory. (Tr. 437). Dr. Trettel found that the plaintiff had no word finding difficulties, no deficits in reading, writing or calculation, fair judgment and insight, a linear and logical thought process, and appropriate thought content. (Tr. 438-39).

Three months later, Dr. Trettel recommended psychotherapy for the plaintiff's mood disorder, but the plaintiff was "unwilling[.]" (Tr. 499). Dr. Trettel opined that the plaintiff would benefit from connecting with the Bureau of Rehabilitation Services for "potential part-time employment." (Tr. 499). Dr. Trettel's opinion was informative in 2016, but there is no evidence that it was retrospective and applied to the plaintiff from 1995 to 2000. Additionally, the results of Dr. Trettel's evaluation are consistent with the other medical evidence of record upon which the ALJ relied, and the ALJ appropriately considered Dr. Trettel's findings in her decision. (Tr. 147).

The only records from an earlier time period are the limited school records (*see* Tr. 347-48), but even those records provide "very little" information about the plaintiff's education and schooling, as both the ALJ and Dr. Trettel appropriately noted. (Tr. 147). The plaintiff reported that he "always had difficult[ies] in school retaining information" (Tr. 419), and that he was diagnosed with developmental delays in language and motor development in childhood (Tr. 458), for which he received some speech and occupational therapy. (*See* Tr. 368, 430, 458). He reported to Dr. Bullard that his developmental milestones as a child were delayed, that his parents did not

seek out assistance for him because they were ashamed of his delays, and that he "struggled throughout his schooling to learn and found language related subjects to be most difficult." (Tr. 430). However, as the ALJ noted appropriately, his grades ranged from As to Fs (*see* Tr. 347-48); he did not repeat a grade due to performance; and he completed his GED. (Tr. 147-48). Additionally, in 2002, just two years after his date last insured, he completed a two-year computer training course in which he learned how to use PowerPoint and Microsoft Word. (Tr. 73, 75, 147-48). The ALJ relied on these records to conclude that, prior to 2000, the evidence "supports, at most, mild limitations" in the plaintiff's ability to understand, remember and carry out instructions. (Tr. 149).

The ALJ's conclusion that the plaintiff had, "at most, mild limitations" in his ability to "adapt[ ]or manag[e] onself[]" and interact with others, is supported by the record. (Tr. 149-50). In 2009, his mother reported to Dr. Torres that the plaintiff was a "sociable man and has friends[,]" and, at that time, he did not have indicators of social or emotional problems. (Tr. 368). In May 2010, Dr. Carter noted that the plaintiff was able to perform tasks at home, but they required a "long time and effort, [and] he need[ed] reminders[,]" and the plaintiff bought prepared meals to be made in the microwave, rarely went out, was "insecure" to go out alone or drive, but could use public transportation, and spent time with others shopping. (Tr. 474). As of December 31, 2015, the plaintiff could dress, bathe, and feed himself, and "cook in limited amounts." (Tr. 389, 415). He could drive, shop for groceries, and, with the help of friends from church, manage finances. (Tr. 389, 415). Similarly, in July 2016, Dr. Trettel found the plaintiff independent in his activities of daily living, although he had some restrictions on driving and cooking on the stove. (Tr. 437). The ALJ also relied on this evidence to conclude that the plaintiff had "at most, mild limitations prior to June 2000" in his ability to understand, remember or carry out instructions, in that the

plaintiff "appear[ed] to be able to be able to live independently and mange his own finances[.]" (Tr. 149).

In addition to the record of cognitive impairments, there is a record detailing physical limitations, but, again, there is no medical evidence prior to 2008. The ALJ addressed the opinions of Dr. Grant and Dr. Sunita Patel, as well as the decision of the prior Administrative Law Judge. (Tr. 147). Dr. Grant found the plaintiff alert and oriented, with normal affect and mood (Tr. 459), and upon examination, the plaintiff's gait was normal, and he could heel toe walk. (Tr. 460). Similarly, Dr. Patel, who completed a case analysis of the plaintiff on May 25, 2010, assessed him with "slight cerebellar vermis hypoplasia with no significant neurologic deficits" and no effects on physical functioning. (Tr. 482).

As the ALJ explained, the more recent examinations support some physical limitation, but again, these examinations fail to relate back to the period prior to the date last insured. (Tr. 147). By 2015, upon physical examination by Dr. Micha Abeles in connection with his application for benefits (Tr. 380-81), the plaintiff had a good range of motion and good grip strength, but he could not do "tandem gait." (Tr. 381). Upon examination at the Neurology Department at UConn Health on December 31, 2015, the plaintiff "f[e]ll[] during retropulsion"[9] and was unable to walk tandem or on tip toes or heels. (Tr. 391, 417). When the plaintiff returned to UConn Health on May 13, 2016, the plaintiff's difficulty with coordination and gait was noted (Tr. 408), and, on May 26, 2016, Dr. Trettel found that the plaintiff was able to rise from a chair with push off, but was unable to stand from a kneeling position and had deficits in his gait. (Tr. 439-40). Additionally, Dr. Trettel observed dysmetria (lack of coordination of movement), gross ataxia (primarily truncal),

---

[9] The retropulsion is a "disorder of locomotion . . . marked by a tendency to walk backwards." https://www.merriam-webster.com/medical/retropulsion (last visited June 5, 2019).

and significant retropulsion pull test with the inability to stay upright on the pull test. (Tr. 440). In July 2016, Dr. Trettel recommended physical therapy for cerebellar dysfunction. (Tr. 499). Thus, though these records may reflect a progression in the plaintiff's physical limitations, there is no medical evidence of physical impairments prior to 2008, and no evidence relating back to the period at issue in this case.

Additionally, as discussed above, there was an earnings record reflecting that the plaintiff worked from 1993-1996 and again in 2004. (Tr. 231, 237; *see also* Tr. 75-76). The plaintiff reported to Dr. Bullard that he last worked in 2004 or 2005 and that he worked for years selling clothing for his family's clothing business. (Tr. 430). Similarly, at his October 2011 hearing in connection with his application for SSI benefits, the plaintiff testified that he worked selling clothing for his family (Tr. 38-39), but had not been able to secure work in a private business. (Tr. 39). He testified that he left the family business because he "couldn't put up with the pressure and the humiliation." (Tr. 39). In his application for benefits, the plaintiff reported that he worked in a clothing store for five hours a day, five days a week from 1993 to May 30, 2004. (Tr. 326). There is one work activity report in the record,[10] but the ALJ appropriately did not give any weight to this assessment because the author was unknown, and there was "doubt as to whether and to what extent the claimant worked for the Quarters of Coverage that he ha[d] been awarded[.]" (Tr. 148).

Additionally, the ALJ did not err in failing to consider the plaintiff's other impairments, as there is no evidence to support the existence of autism or depression during the covered period. In

---

[10]A Work Activity Questionnaire completed by Luisa Lorenzo on behalf of the plaintiff on February 23, 2015, states that, when working, the plaintiff did not complete all of his usual duties, did not complete his duties without special assistance, did not complete the same amount of work as employees in similar positions, and produced fifty percent less than other employees in similar positions. (Tr. 224-25).

Dr. Valentin-Colon's April 2015 evaluation of the plaintiff, she noted that the plaintiff reported that he had a form of autism, but Dr. Valentin-Colon concluded that she did not have "enough information to support a clinical diagnosis of an Autism Spectrum Disorder." (Tr. 375). Similarly, although the plaintiff's treating providers at UConn noted depressive symptoms in October 2016 (Tr. 443 (plaintiff reported "some issues with depression and he occasionally feels lonely and sad"), there are no records relating to depression prior to that time. Although the plaintiff argues that he qualifies for disability benefits because of the existence of Joubert Syndrome (Doc. No. 20, at 3), in May 2016, the plaintiff was told by his doctors at UConn that although his history and examination were "suggestive" of Joubert syndrome, the MRI of his brain did not reveal findings suggestive of this syndrome. (Tr. 406-12).

The ALJ appropriately concluded that the "record shows no evidence of significant functional limitations directly associated with [cerebellar vermian hypoplasia] prior to June 2000." (Tr. 149); *see Reynolds v. Colvin*, 570 F. App'x 45,47 (2d Cir. 2014) (summary order) (holding that the "lack of supporting evidence on a matter where the claimant bears the burden of proof,. . . can constitute substantial evidence supporting the denial of benefits.") (citing *Talavera v. Astrue*, 679 F.3d 145, 153 (2d Cir. 2012). Once an ALJ concludes that "a condition is not severe[,]" the ALJ reaches a finding that the "plaintiff is not disabled, and the [ALJ's] inquiry stops at the second level of the five-step sequential evaluation process." *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (citing 20 C.F.R. § 404.1520(c)); *see e.g., Swainbank v. Astrue,* No. 06–CV–248, 2008 WL 731302 at *3 (D. Vt. Mar. 18, 2008) (noting that the ALJ "correctly summarized the issue in this case: 'regardless of how genuine the claimant's complaints may appear to be, when there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment that could reasonably be

expected to produce the claimant's symptoms, a finding of not disabled is required at step two of the sequential evaluation process.'" (citations & emphasis omitted)), *aff'd,* 356 F. App'x. 545 (2d Cir. 2009); *see also, e.g., Jones v. Astrue,* No. 09–CV–1232, 2012 WL 1605566 at *7 (N.D.N.Y. Apr. 17, 2012) (holding that the ALJ did not err when the "ALJ's sequential evaluation ended at step two, with the (adequately supported) conclusion that there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment on or before December 31, 2001. . . ." ), *report and recommendation adopted,* 2012 WL 1605593 (N.D.N.Y. May 8, 2012). The Court finds no error with the ALJ's conclusion in this case.

VI.     CONCLUSION

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 20) is *denied*, and the defendant's Motion to Affirm (Doc. No. 21) is *granted.*

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

Dated this 18th day of July, 2019 at New Haven, Connecticut.

 /s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge